# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

```
_____
                                  )
Dana-Farber Cancer Institute, Inc.,)
                                  )
        Plaintiff,                )
                                  )          Civil Action
v.                                )          No. 19-cv-11380-PBS
                                  )
Bristol-Myers Squibb, Co.,        )
E. R. Squibb & Sons, L.L.C., and  )
Ono Pharmaceutical Co., Ltd.,     )
                                  )
        Defendants.               )
_____)
```

## MEMORANDUM AND ORDER

August 13, 2021

Saris, D.J.

## INTRODUCTION

This case involves a ground-breaking, life-saving invention in the field of cancer immunotherapy. In an earlier case, plaintiff Dana-Farber Cancer Institute, Inc. ("Dana-Farber") brought an action seeking to correct inventorship of six disputed patents under 35 U.S.C. § 256 (the "Inventorship Case"). On May 17, 2019, this Court held that Dr. Gordon Freeman of Dana-Farber and Dr. Clive Wood, formerly of the Genetics Institute, previously unnamed as inventors of the patents, were joint inventors of the six disputed patents. Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co., 379 F. Supp. 3d 53, 100 (D. Mass.

2019), aff'd, 964 F.3d 1365 (Fed. Cir. 2020), cert. denied sub

nom. Ono Pharm. Co. v. Dana-Farber Cancer Inst., Inc., No. 20-

1258, 2021 WL 2044661 (U.S. May 24, 2021).

On June 21, 2019, Dana-Farber commenced the current action

against Defendants Bristol-Myers Squibb, Co.; E.R. Squibb &

Sons, L.L.C.; and Ono Pharmaceutical Co., Ltd. (collectively,

"Defendants") alleging, among other things, employment of unfair

methods of competition and unfair trade practices (Count I),

tortious interference with prospective business relationships

(Count II), and unjust enrichment (Count III).

On July 30, 2019 and August 20, 2019, the Patent Office

added Drs. Freeman and Wood as co-inventors.

On December 19, 2019, this Court issued an administrative

stay pending the resolution of the appeal in the Inventorship

Case. Docket No. 66. The Federal Circuit affirmed this Court's

decision in an opinion and judgment issued on July 14, 2020, and

the mandate of the court issued on October 23, 2020. This Court

then restored the case to the active docket. Docket No. 75.

Dana-Farber filed an Amended and Supplemental Complaint on

January 7, 2021 which added a request for a judicial declaration

regarding the inventorship of two newly disputed patents. Docket

No. 82. Defendants filed their Motion to Dismiss on February 5,

2021. Docket No. 90. Dana-Farber opposed, and Defendants filed a

Reply.[1] Docket Nos. 97, 105. On May 5, 2021, by agreement, judgment was entered pursuant to 35 U.S.C. § 256 in favor of Dana-Farber as to Dana-Farber's claim for correction of inventorship on these new patents. Docket No. 125.

Defendants contend that the Amended and Supplemental Complaint should be dismissed because (1) it is barred under the doctrine of claim preclusion; (2) the claims are preempted under Federal Patent Act; (3) most of the claims are time-barred under the statute of limitations; and (4) Dana-Farber has failed to plead a viable tortious interference claim.

After a hearing, Defendants' Motion to Dismiss the Amended and Supplemental Complaint (Docket No. 90) is **DENIED**.

I.   **FACTUAL BACKGROUND**

   **A. The Parties**

Dana-Farber is a non-profit corporation which treats adults and children suffering from cancer, provides training for physicians and scientists, and develops future cancer therapies through research. Bristol-Myers Squibb Co. ("BMS") and its subsidiary E. R. Squibb & Sons LLC (collectively, "Bristol-Myers") are biopharmaceutical companies that discover, develop, and deliver medicines for curing serious diseases. Ono

---

[1] The parties also battled over sealing the licenses referred to in the Complaint. See Docket Nos. 121, 127, 128, 129, 137, 138, 139, 141, 143.

Pharmaceutical Co., Ltd. ("Ono") is a Japanese corporation also committed to pursuing the discovery and development of life-saving treatments.

**B. The Inventorship Case**

In September 2015, Dana-Farber initiated the Inventorship Case by filing for correction of inventorship of six patents relating to methods of cancer immunotherapy administration of PD-1 and PDL-1 antibodies. Docket No. 82 ¶¶ 3, 20, 21, 22, 33. Dana-Farber alleged that its scientist Dr. Freeman (as well as another scientist, Dr. Clive Gordon) was wrongfully omitted as an inventor. Id. ¶ 3. Pfizer intervened in the Inventorship Case because it and Wyeth LLC were the parent companies of Genetics Institute, which employed Dr. Wood.

In February 2019, on the eve of trial in the Inventorship Case, Defendants settled their infringement action with Pfizer. In the settlement, Pfizer obtained a license for the patents. Id. ¶ 81. Under the agreement, Defendants paid Pfizer an upfront payment plus a share of Defendants' future royalties and agreed to pay Pfizer a "bonus" (Dana-Farber's word) in the event that Defendants succeeded in keeping Dr. Freeman off of the patents. Id. ¶¶ 81, 83. The agreement contained a restrictive covenant that stipulated that Pfizer not seek or obtain a license from any third party (which included Dana-Farber) even if its license was later terminated. Id. ¶¶ 81, 85. In exchange, Pfizer agreed

to withdraw its inventorship claim to the patents. Id. ¶ 81.
Pfizer also agreed not to support Dana-Farber "in any pending
Legal Proceedings among [Dana-Farber] and the BMS/Ono Parties"
and agreed that "no Pfizer consultants or advisors shall
participate as witnesses (unless by operation of a valid
subpoena) or consultants or advisors in connection with any such
Legal Proceeding." Id. ¶ 83. This last-minute surprise
settlement meant that Dr. Gordon did not appear to testify as
scheduled, and the trial had to be briefly continued. He did
eventually testify.

On May 17, 2019, after a bench trial, this Court ruled in
Dana-Farber's favor, finding that Dr. Freeman and Dr. Gordon
were joint inventors to the patents. Id. ¶ 23. The patents
expire in either 2023 or 2024.

## C. Defendants' Patent Infringement Litigation Against Merck and Other Companies

In September 2014, The U.S. Food and Drug Administration
(the "FDA") approved Merck & Co.'s ("Merck") PD-1 blocking
antibody Keytruda®. Id. ¶ 61. That same day, Defendants and Dr.
Honjo, the named inventor of the patents, filed a patent
infringement lawsuit against Merck. Id. ¶ 62. In 2015,
Defendants filed two additional patent infringement lawsuits
against Merck. Id. ¶ 67. Only Defendants and Dr. Honjo, then the
sole parties with ownership rights to the patents, had standing

to sue. Id. ¶ 69. Defendants subsequently filed additional patent infringement actions against Genentech, Pfizer, and AstraZeneca. Id. ¶ 79.

### D. Defendants' Other Licensing Agreements

Throughout the pendency of the Inventorship Case, Defendants aggressively pursued commercial opportunities regarding the patents. On January 1, 2017, Defendants entered into a settlement agreement with Merck pursuant to which Merck obtained a license for the patents. In exchange, Merck paid Defendants an upfront fee of $625 million plus an ongoing royalty of 6.5% on worldwide sales of Keytruda®. Id. ¶ 71. Since 2017, Defendants have received more than $2 billion in royalties from Merck. Id. ¶ 74. The agreement also stipulated that Merck would (1) never seek or obtain a license of any of the patents from any third party, even if Merck's license with Defendants were later terminated; (2) not challenge the inventorship of the patents or support a third party inventorship challenge; and (3) not provide any attorney work-product covering incorrect inventorship to any third party. Id. ¶¶ 72, 82.

In August 2018, Defendants entered into a licensing agreement with Regeneron and Sanofi for the patents in exchange for which Regeneron and Sanofi paid Defendants an up-front fee of $20 million plus an ongoing royalty of 8% on worldwide sales

of Regeneron and Sanofi's co-marketed PD-1 product Libtayo®.[2] Id.
¶¶ 88,89.

### E. Dana-Farber's Licensing Negotiations

On May 17, 2019, this Court issued its ruling in the
Inventorship Case, holding that Dr. Freeman and Dr. Wood were
co-inventors to the patents. Twelve days later, representatives
from a Massachusetts-based biopharmaceutical company ("Company
A") approached Dana-Farber to propose that Dana-Farber grant it
a non-exclusive license to the patents. Id. ¶ 96. On June 10,
2019, Company A informed Dana-Farber that it no longer wished to
pursue a license from Dana-Farber. Id. ¶ 98. In the fall of
2020, Dana-Farber was engaged in negotiations with another
prospective licensee of the patents ("Company B"[3]). In the midst
of negotiations, Company B informed Dana-Farber that it had
entered into a licensing agreement with Defendants. Id. ¶ 101.

## II.  CLAIM PRECLUSION

Claim preclusion "prevents parties from raising issues that
could have been raised and decided in a prior action—even if
they were not actually litigated." Lucky Brand Dungarees, Inc.

---

[2] Defendants have not produced the Regeneron/Sanofi license
agreement. Id. ¶ 94. Dana-Farber asserts on information and
belief that the agreement contains restrictive covenants
regarding Regeneron and Sanofi's use of the patents similar to
those contained in the Merck and Pfizer licenses. Id. ¶ 93.
[3] After filing the Amended and Supplemental Complaint, Dana-
Farber received permission from Company B to disclose its name:
Genentech. Docket No. 97 at 26 n.11.

v. Marcel Fashions Grp., Inc., 140 S. Ct. 1589, 1594 (2020). In

Lucky Brand Dungarees, the Supreme Court applied the rules of

claim preclusion to hold that defense preclusion did not apply

in a trademark action which challenged different conduct and

raised different claims from an earlier action between the

parties. Id. at 1596. The Supreme Court determined that (1) a

different judgment in the second action would not impair or

destroy rights or interests established by the judgment entered

in the first action where the lawsuits involved both different

conduct and different trademarks; and (2) the complained-of

conduct in the more recent action occurred after the conclusion

of the earlier action. Id. at 1595-96. The Court concluded that:

> At bottom, the [later] Action involved different
> marks, different legal theories, and different
> conduct—occurring at different times. Because the two
> suits thus lacked a 'common nucleus of operative
> facts,' claim preclusion did not and could not bar
> Lucky Brand from asserting its settlement agreement
> defense in the [later] Action.

Id. at 1596.

Defendants contend that, because this case derives from the

same nucleus of operative facts as the Inventorship Case, the

claims are precluded. For support, Defendants rely heavily on

Porn v. Nat'l Grange Mut. Ins. Co., 93 F.3d 31 (1st Cir. 1996),

which determined that:

> For a claim to be precluded, the following elements
> must be established: (1) a final judgment on the
> merits in an earlier action, (2) sufficient identity

between the causes of action asserted in the earlier
and later suits, and (3) sufficient identity between
the parties in the two suits.

Id. at 34. Defendants correctly submit that, here, the first and

third elements have been met. The question therefore is whether

there is "sufficient identity between the causes of action

asserted" in the Inventorship Case and this case.

In Porn, the First Circuit considered the case of an

insured motorist who successfully sued his insurer for breach of

contract for refusing to pay his claim for underinsured motorist

benefits incurred during a car accident ("Porn I").

Subsequently, the motorist brought a diversity action against

the insurer, alleging its conduct in handling the claim

constituted breach of the covenant of good faith, intentional

infliction of emotional distress, negligent infliction of

emotional distress, and violations of the Connecticut Unfair

Insurance Practices Act and the Connecticut Unfair Trade

Practices Act ("Porn II"). The district court in Porn II granted

summary judgment in favor of the insurer based on the doctrines

of collateral estoppel and res judicata.

In affirming the grant of summary judgment, the First

Circuit applied the "transactional" approach as defined in the

Restatement (Second) of Judgments. Porn, 93 F.3d at 34 (quoting

Manego v. Orleans Bd. of Trade, 773 F.2d 1, 5 (1st Cir. 1985)).

According to the Restatement:

> (1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.
>
> (2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

Restatement (Second) of Judgments § 24 (1982). The First Circuit analyzed the following factors: (1) whether the facts were related in time, space, origin, or motivation, (2) whether they formed a convenient trial unit, and (3) whether their treatment as a unit conformed to the parties' expectations or business understanding or usage. Porn, 93 F.3d. at 34-37.

The court found that, first, the facts underlying the two claims were closely related in time, space, origin, and motivation: the bad faith claim and the contract claim derived from the same occurrence (the insurer's refusal to pay under the policy), both claims sought redress for the same basic wrong, and both claims rested on a similar factual basis. Id. at 34-35. Second, the court determined that the bad faith claim would use much of the same evidence as the breach of contract claim, thus forming a convenient trial unit. Id. at 36. Third, the court

concluded that, because the two claims arose in the same time frame out of similar facts and the motorist knew the facts necessary to bring a bad faith claim when he brought the breach of contract claim, one would reasonably expect both claims to be brought together. Id. at 37. Accordingly, the First Circuit held that the two lawsuits involved sufficiently identical causes of action and therefore that the bad-faith claims were barred by claim preclusion. Id.

Here, Defendants urge the Court to find that, applying the factors outlined in Porn, Dana-Farber is precluded from bringing its claims by the Inventorship Case. This argument is not persuasive.

First, while the facts of the Inventorship Case and this case are related, they do not share the same nucleus of operative facts. The claims in this case are made possible because of the outcome of the Inventorship Case, but they do not arise out of a single transaction or series of connected transactions. The Inventorship Case turned on a dispute over the details of a scientific collaboration in the complex area of cancer immunotherapy. This case concerns corporate licensing. The Inventorship Case focused on the years 1999 to 2003. This case involves conduct from 2017 onward. The Inventorship Case was initiated in 2015. The license agreements at issue here were entered into in 2017.

11

In Lucky Brand Dungarees, the Supreme Court noted that "events that occur after the plaintiff files suit often give rise to new material operative facts that in themselves, or taken in conjunction with the antecedent facts, create a new claim to relief." Lucky Brand Dungarees, 140 S. Ct. at 1596 (cleaned up); see also Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292, 2305-06 (2016), as revised (June 27, 2016). Here, the judgment in the Inventorship Case in conjunction with the conduct from 2017 onward creates Dana-Farber's claim for relief. Thus, the claims in this case are distinct from those in the Inventorship Case.

Second, the operative facts in the two cases would not have formed a "convenient trial unit." The facts that were entered into evidence during the trial of the Inventorship Case pertained to the research collaboration between scientists in the years 1999 to 2003 and their individual scientific contributions to the patents. None of that evidence is relevant to support Dana-Farber's new claims that Defendants obstructed Dana-Farber's rights as a co-inventor of the patents through licensing agreements with restrictive covenants.

Third, the parties could not have expected the claims to be considered together as a unit because the alleged conduct giving rise to Dana-Farber's new claims had not yet occurred at the time of the Inventorship Case. Dana-Farber had no knowledge when

it initiated the Inventorship Case in September 2015 of the
facts necessary to bring its current claims.

Accordingly, Dana-Farber's claims are not precluded.

### III. PREEMPTION

Plaintiff argues that the restrictive covenants with Merck
and Pfizer (and maybe others) were anticompetitive because they
prevented the companies from ever seeking a license from Dana-
Farber at a lower rate, thereby inflating the price of the drug
to cancer patients.  Defendants contend that the federal Patent
Act preempts Dana-Farber's state law claims because it provides
only one remedy for failure to list a co-inventor on a patent –
correction of the inventorship on that patent.  Specifically,
Defendants submit that, under patent law, (1) they validly owned
the patents during the relevant time periods, (2) the
inventorship of the patents was corrected by this Court's order,
and (3) they were within their rights as owners of the patents
to license and litigate the patents throughout the relevant time
periods.

Article I, Section 8, Clause 8, of the United States
Constitution grants Congress the power "[t]o promote the
Progress of Science and useful Arts, by securing for limited
Times to Authors and Inventors the exclusive Right to their
respective Writings and Discoveries." Under this authority,
Congress enacted the federal Patent Act, 35 U.S.C. §§ 1–376.

13

Pursuant to the Supremacy Clause, U.S. Const. art. VI, cl. 2, state causes of action are preempted if they stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting a statute. Hines v. Davidowitz, 312 U.S. 52, 67 (1941).

Defendants argue that there is a direct conflict between federal patent law and Dana-Farber's state law claims because Defendants' conduct was protected by 35 U.S.C. §§ 256 and 262. Section 256 provides:

> (a) Correction. – Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

> (b) Patent Valid if Error Corrected. – The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

Section 262 provides:

> In the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners.

The Supreme Court has given some guidance as to how and when federal patent law preempts state law claims. In

determining whether a state regulation clashes with the objectives of the federal patent laws, the Supreme Court in Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470 (1974), identified three objectives of patent law: (1) providing an incentive to invent, (2) promoting the full disclosure of inventions, and (3) ensuring that "that which is in the public domain cannot be removed therefrom by action of the States." Id. at 480–81.

Applying the Kewanee factors, the Federal Circuit has permitted state-law claims to proceed against inventors in certain circumstances.  For example, it concluded that an unjust enrichment claim does not impermissibly interfere with the federal patent scheme where it "benefits society by requiring '[a] person who has been unjustly enriched at the expense of another . . . to make restitution to the other.'" Univ. of Colo. Found., Inc. v. Am. Cyanamid Co., 342 F.3d 1298, 1307 (Fed. Cir. 2003) ("Cyanamid VI") (quoting Restatement of Restitution § 1 (1937)) (alterations in original).  In Cyanamid VI, the inventors copied parts of a confidential manuscript written by two doctors to obtain a patent.  Id. at 1303–04.  After a finding that the patent was improperly secured, the Federal Circuit held that the doctors' claim of unjust enrichment was not preempted because it was "a legal claim to remedy the breach of a contract implied in law for disclosure of their

confidential manuscript in exchange for a promise not to disseminate the idea without the Doctors' consent." Id. at 1306.

The Federal Circuit also held that a state-law claim for intentional interference with actual and prospective contractual relations was not preempted by patent law, reasoning that:

> None of the three factors identified in Kewanee are implicated by a state tort remedy for intentional interference with actual and prospective contractual relations in instances where the tortfeasor's threats to sue were based upon infringement of a patent obtained by inequitable conduct.

Dow Chem. Co. v. Exxon Corp., 139 F.3d 1470, 1475 (Fed. Cir. 1998). In Dow Chemical, the plaintiff had claimed before the district court that defendant Exxon Corp. had engaged in unfair competition when it made threats to sue prospective and actual customers of Dow Chemical for patent infringement even though Exxon Corp. had no good faith belief that infringement had occurred. Id. at 1472.  Dow Chemical argued that it should be permitted to present that Exxon Corp. had engaged in inequitable conduct before the PTO in support of its claim of unfair competition. The district court excluded the evidence, "declining to allow what in essence is a patent trial to proceed in the guise of a business tort trial." Id. at 1472-73 (cleaned up). On appeal, the Federal Circuit overruled the district court, noting that "a key purpose behind this tort is the protection of the integrity of commercial contracts which . . .

'traditionally are the domain of state law.'" Id. at 1475 (quoting Aronson v. Quick Point Pencil Co., 440 U.S. 257, 262 (1979)).

Defendants distinguish this case from Cyanamid VI and Dow Chemical by pointing out that those cases concerned patents obtained through inequitable conduct, which is not alleged here. They submit that this case is more like Tavory v. NTP, Inc., 297 F. App'x 976 (Fed. Cir. 2008) (unpublished). In Tavory, an independent technical consultant brought action against a patent holder seeking to be joined as inventor with respect to six patents and claiming copyright infringement and unjust enrichment based on the patent holder's previous settlement with a third party for patent infringement. Id. at 978. The Federal Circuit determined that plaintiff was not a co-inventor but added that, even if it had not made that determination, the dismissal of the state-law unjust enrichment claim seeking monies from the licensing and enforcement of the patents was proper. Id. at 983. It reasoned that the plaintiff could not "sidestep § 262," which governs licensing by co-inventors. Id. In other words, because the co-inventors did not get an "ill-gotten" gain, there was no unjust enrichment. Id.

Defendants insist that the plaintiff must allege that a defendant's conduct in obtaining a patent amounted to fraud or bad faith in order to avoid claim preemption of its state law

claims. See Hunter Douglas, Inc. v. Harmonic Design, Inc., 153
F.3d 1318, 1336–37 (Fed. Cir. 1998), overruled on other grounds
by Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356
(Fed. Cir. 1999) ("[I]f the plaintiff were to fail to allege
that the defendant patentholder was guilty of fraudulent conduct
before the PTO or bad faith in the publication of a patent, then
the complaint would be dismissed for failure to state a claim
upon which relief can be granted because of federal
preemption."); see also Viskase Corp. v. Am. Nat. Can Co., 261
F.3d 1316, 1329 (Fed. Cir. 2001) ("Absent fraud or deceptive
intent, the correction of inventorship does not affect the
validity or enforceability of the patent for the period before
the correction.").

During the time Defendants were listed as the sole
inventors of the patents, Defendants correctly argue they were
within their rights as defined by 35 U.S.C. § 262 to license the
patents on whatever conditions they chose. Schering Corp. v.
Roussel-UCLAF SA, 104 F. 3d 341, 344 (Fed. Cir. 1997) (holding
that a co-owner of a patent has the right "to license others, a
right that also does not require the consent of any other co-
owner"). Although they were on notice that their exclusive
ownership of the patents was being challenged as of 2015, patent
law does not limit the rights of a patent-owner to license and
litigate prior to the correction of inventorship. Shum v. Intel

Corp., 630 F. Supp. 2d 1063, 1078-79 (N.D. Cal. 2009). Although Dana-Farber criticizes Defendants for prolonging the litigation through the use of unsavory litigation tactics such as filing frivolous motions and obstructing the litigation by offering Pfizer a "bonus", Dana-Farber has not alleged facts to support a claim that Defendants fraudulently or in bad faith omitted Dr. Freeman or Dr. Gordon as an inventor of the patents. Therefore, to the extent plaintiff seeks monetary damages for unjust enrichment before the correction of inventorship, they are preempted by federal patent law.

However, § 262 does not protect Defendants from unfair competition in the marketplace after the correction of inventorship. The First Circuit has noted that "[c]ourts have distinguished state claims alleging bad faith misconduct by the applicant against the PTO—which are preempted—from state claims alleging bad faith misconduct occurring subsequently in the marketplace—which are not." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 236 (1st Cir. 2005) (emphasis in original). These claims are of the latter variety. See id. (holding that an unjust enrichment claim was not preempted by federal patent law).

The crux of this case is whether Defendants engaged in misconduct when they used their status as sole inventors to prohibit a potential co-inventor from exercising its rights

under § 262 after the correction of inventorship. Applying state
law to this case involving co-inventors does not conflict with
the patent code: it promotes its goals of providing an incentive
to invent.

Dana-Farber has a plausible argument that Defendants'
effort to limit a licensee's ability to negotiate with a co-
inventor after the license is terminated is an unfair trade
practice which is contrary to the purpose of the patent laws
because it deprives the consuming public of the invention at a
lower royalty rate from a valid co-inventor. See Kimble v.
Marvel Ent., LLC, 576 U.S. 446, 452 (2015).

The restrictive covenant here constitutes "conduct that
does not bear on federal patent policies." Cyanamid IV, 196 F.
3d at 1371. Dana-Farber's state-law claims of tortious
interference, unjust enrichment, and unfair practices under
Mass. Gen. Laws ch. 93A, § 11 are not preempted to the extent
they concern Defendants' efforts to impede another co-inventor's
efforts to exercise his right to license the patent under § 262.
However, the Pfizer and Merck licenses appear to terminate at
the expiration of the patents or upon material breach of the
terms of the contracts. Therefore, it is unclear whether the
invalidation of the enforceability of the post-termination

provision in the restrictive covenant would have much import.
The court need not address that issue here.[4]

As Dana-Farber was only declared a co-inventor of the
patents on May 17, 2019, any claims of injury prior to that date
are preempted.

## IV.   STATUTE OF LIMITATIONS

### a. Unjust Enrichment

Defendants contend that Dana-Farber's claim for unjust
enrichment accrued between 2009 and 2015 when the patents were
issued without naming Drs. Freeman or Wood as co-inventors[5] and
is therefore time-barred as falling outside the three-year
statute of limitations. Dana-Farber responds that its claim
accrued in 2017 when Defendants entered into a licensing
agreement with Merck because Defendants falsely held themselves
out to be exclusive owners of the patents in those negotiations.
As discussed above, Dana-Farber's injury accrued when it became
a co-inventor of the patents in 2019; therefore, the claim is
not barred.

---

[4] The Court takes no position as to whether any unfair trade
practices were involved with respect to Defendants' negotiations
with Company A and Company B, as those arguments were not fully
developed.
[5] All of the six patents issued between 2009 and 2015 (except for
U.S. Patent No. 9,402,899, which issued in 2016). Defendants
acknowledge that, under their theory, a claim for unjust
enrichment based upon the issuance of the '899 Patent does not
fall outside the statute of limitations.

### b. Tortious Interference

Defendants argue that Dana-Farber's claim for tortious interference accrued when Defendants filed patent infringement actions against Merck in 2014 and 2015 and is therefore time-barred as falling outside the three-year statute of limitations. Dana-Farber repeats its earlier response that its claim accrued in 2017 when it was harmed by Defendants' licensing agreement with Merck. As previously stated, Dana-Farber's injury accrued when it became a co-inventor of the patents in 2019; therefore, the claim is not barred.

### c. Chapter 93A

Defendants reiterate their position that Dana-Farber's claim accrued when the patents were issued without naming Drs. Freeman or Wood as co-inventors. Dana-Farber repeats its response. As previously stated, and the claim is not barred.

## V. TORTIOUS INTERFERENCE

Defendants contend that Dana-Farber has not pleaded sufficient facts to satisfy the elements of tortious interference. To prevail on such a claim, Dana-Farber must establish that (1) it had an advantageous relationship with a third party and (2) Defendants knowingly induced a breaking of the relationship in a manner that (3) was improper in motive or means and (4) harmed Dana-Farber. See Blackstone v. Cashman, 860 N.E.2d 7, 12-13 (Mass. 2007). Defendants submit that Dana-Farber

has failed to allege facts supporting the second and third factors.

In support of its tortious interference claim, plaintiff alleges that Dana-Farber's "technology transfer mission is well known among pharmaceutical companies," that Defendants were aware of Dana-Farber's past licensing relationships (including with BMS and its subsidiary Medarex), and that Dana-Farber announced its intention to grant licenses in its 2015 complaint in the Inventorship Case. Docket No. 82 ¶¶ 107-09. Dana-Farber alleges that Defendants induced at least three known companies not to enter into business relationships with Dana-Farber to license the patents. These facts sufficiently allege that Defendant knowingly interfered with Dana-Farber's business relationships. See Alnylam Pharms., Inc. v. Dicerna Pharms., Inc., No. MICV20154126, 2017 WL 6395719, at *4-5 (Mass. Sup. Ct. Oct. 23, 2017); see also Sinotau Pharm. Grp. v. Navidea Biopharmaceuticals, Inc., 211 F. Supp. 3d 375, 381 (D. Mass. 2016). Plaintiff further alleges that Defendants acted maliciously and in bad faith when they negotiated restrictive covenants with their licensees to prevent licensees from pursuing licensing opportunities with Dana-Farber.  Docket No. 82 ¶¶ 72, 76, 81-85, 89-93, 101-103, 112, 131. These facts sufficiently allege improper motive or means.

Accordingly, Dana-Farber has stated a claim of tortious interference.

## VI.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Docket No. 90) is **DENIED**.

SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
United States District Judge
