UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

DANA-FARBER CANCER INSTITUTE,
INC.

               Plaintiff,          No. 19-cv-11380-PBS

v.

BRISTOL-MYERS SQUIBB CO.; E.R.
SQUIBB & SONS, LLC; ONO
PHARMACEUTICAL CO., LTD.,


               Defendants.

---

**MEMORANDUM AND ORDER RE:**
**PLAINTIFF'S MOTION TO COMPEL (DKT. NO. 255) AND MOTION TO COMPEL**
<u>**THIRD PARTY PFIZER, INC. (DKT. NO. 256)**</u>

Cabell, U.S.M.J.

I.   <u>**INTRODUCTION**</u>

In the present case, plaintiff Dana-Farber Cancer Institute,
Inc. ("Dana-Farber"), a cancer research and treatment nonprofit,
asserts claims of unfair trade practices, tortious interference,
unjust enrichment, and correction of inventorship against
defendants Bristol-Myers Squibb Co., a pharmaceutical company;
E.R. Squibb & Sons, L.L.C., a subsidiary of Bristol-Myers Squibb
Co. (collectively, "BMS"); and Ono Pharmaceutical Co., Ltd.
("Ono"), a pharmaceutical company headquartered in Japan. [Dkt.
No. 82]. In the course of discovery, Dana-Farber requested BMS

and Pfizer Inc. ("Pfizer"), a pharmaceutical company and non-party in this suit, to each produce certain categories of documents and testimony pertaining to internal communications and communications with outside counsel.  BMS and Pfizer have invoked the attorney-client privilege and work-product doctrine in declining to produce these materials, and Dana-Farber now moves the court to compel their production.  [Dkt. No. 255; Dkt. No. 256].

For context, the two motions to compel relate to a prior case involving the above-named parties, in which Dana-Farber and Pfizer sued BMS and Ono.  *See Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 379 F. Supp. 3d 53 (D. Mass. 2019).  As that case neared trial, and indeed on the eve of trial, BMS and Pfizer reached a settlement agreement which, among other things, placed certain limitations on the degree to which Pfizer could facilitate the production of witnesses or evidence at trial that might be favorable to Dana-Farber, and provided for a substantial payment to Pfizer by BMS, with more to follow if BMS were to achieve a favorable outcome in the suit with Dana-Farber.

One motion to compel is directed at BMS while the other is directed at Pfizer.  The materials sought in each motion are the same.  Dana-Farber moves to compel the production of the following two sets of documents and related testimony:

1. For the period of October 15, 2018 to February 14, 2019, [BMS and Pfizer]'s internal communications and communications with outside counsel concerning (1) Section 7.1 of the License and Settlement Agreement entered into between BMS, Ono Pharmaceuticals Co., Ltd., Pfizer Inc., Wyeth LLC, and Genetics Institute LLC effective as of February 1, 2019 (the "Agreement"); and/or (2) Section 5.1.2 of the Agreement; and

2. For the period of January 28, 2019 to February 14, 2019, [BMS and Pfizer]'s internal communications and communications with outside counsel concerning three witnesses (Clive R. Wood, Mary Collins, and Andrew Long) who failed to appear on the first day of trial in the inventorship litigation.

As noted, BMS and Pfizer contend that the requested information is shielded from disclosure by the attorney-client privilege or work product doctrine. Dana-Farber argues that BMS and Pfizer have waived any privilege. Alternatively, it argues that the crime-fraud exception to attorney-client privilege applies. BMS and Pfizer contest these arguments and, in addition, BMS objects that the requests are untimely and seek information not relevant to the present action.

For the following reasons, the court orders BMS and Pfizer to produce the requested materials to this court for *in camera* review and reserves its ruling on the motions until the review is complete.

## II.   **FACTUAL BACKGROUND**

This case arises out of a prior action concerning an inventorship dispute (hereafter, the "inventorship litigation"). *See Dana-Farber Cancer Inst., Inc.*, 379 F. Supp. 3d at 53.   On September 25, 2015, plaintiff Dana-Farber filed its initial complaint against defendants BMS and Ono seeking to correct five patents[1] related to cancer immunotherapy[2] by adding Dr. Gordon Freeman, a Dana-Farber scientist, and Dr. Clive Wood, a former head of drug development at Genetics Institute, as joint inventors. [1:15-cv-13443-PBS (hereinafter "Inventorship litigation docket"), Dkt. No. 1].   Pfizer intervened as a plaintiff because Dr. Wood had assigned his rights and interests in the patents to Genetics Institute, Pfizer's predecessor in interest.

Pfizer settled with BMS on the eve of trial.   The terms of the settlement agreement provided, *inter alia*, that: (1) BMS would pay Pfizer a certain lump sum; (2) Pfizer would not support Dana-Farber in the inventorship litigation; (3) no Pfizer consultants or advisors would participate in the inventorship litigation as

---

[1] In its amended complaint, Dana-Farber sought the correction of an additional patent for a total of six patents.  [Inventorship litigation docket, Dkt. No. 98].

[2] Cancer immunotherapy is a groundbreaking cancer treatment method that uses the body's immune system to identify and attack tumor cells.  [Dkt. No. 82]. BMS is one of a relative few companies that manufacture cancer immunotherapy drugs known as "immune checkpoint inhibitors," specifically those administering PD-1 and PDL-1 antibodies.  The patents at issue in the inventorship litigation relate to this new class of cancer treatment. *Immunotherapy to Treat Cancer*, NAT'L CANCER INST., https://www.cancer.gov/about-cancer/treatment/types/immunotherapy (last visited Oct. 24, 2022).

witnesses or otherwise except by operation of a valid subpoena; and (4) BMS would pay Pfizer an additional sum if BMS settled with or prevailed over Dana-Farber in the inventorship litigation. [Dkt. No. 258-5]. The following morning, on the first day of trial, Pfizer reported to the court that it had reached a settlement and was no longer a party to the case. [Inventorship litigation docket, Dkt. No. 359, p. 8].

Not long after, it became clear that the first three witnesses for the plaintiff scheduled to testify that day -- Drs. Wood, Collins, and Long -- were not present at trial. [Inventorship litigation docket, Dkt. No. 359, pp. 13-14]. Dana-Farber indicated that it did not have contact with these witnesses, that the three witnesses "were witnesses Pfizer was going to put on," and that Dana-Farber had asked Pfizer to speak with the witnesses shortly after learning about the settlement agreement the night before, but Pfizer did not respond. [Inventorship litigation docket, Dkt. No. 359, pp. 13-14]. Dana-Farber further indicated to the court that it was relying on the production of Drs. Wood and Collins to make its case, while the production of Long was perhaps not necessary.[3] [Inventorship litigation docket, Dkt. No. 359, p. 16].

---

[3] Drs. Wood and Collins, both former Pfizer-affiliated scientists, were listed on Dana-Farber and Pfizer's combined witness list as live trial witnesses. [Inventorship litigation docket, Dkt. No. 337, p. 2]. Dana-Farber subsequently produced its own witness list on the first day of trial, which likewise listed Collins and Wood as live trial witnesses. [Inventorship litigation docket, Dkt. No. 340, p. 2].

Pfizer informed the court that it had not brought the witnesses to trial that day and that it did now know their precise whereabouts at that time. Pfizer did, however, indicate that Dr. Wood lived in Germany and that Dr. Collins, though she had a home in Natick, MA, lived in Florida during that time of year. [Inventorship litigation docket, Dkt. No. 359, pp. 15-20]. The court ordered Pfizer to contact the two witnesses by phone and inform them that they were expected to appear at trial that same day or on the following day. [Inventorship litigation docket, Dkt. No. 359, pp. 16-19]. Later on the first day of trial, Pfizer informed the court that, while Dr. Wood was set to appear the following day, Dr. Collins's availability was in doubt. [Inventorship litigation docket, Dkt. No. 359, pp. 50-52]. Specifically, Pfizer's counsel told the court the following:

> A different lawyer at my firm who has been working with Dr. Collins reached out to Dr. Collins. Dr. Collins is heading back to Florida. We expressed your Honor's desire for her participation. Her response was that she was willing to participate and come up from her winter home in Florida for Pfizer -- she's a former employee, she's retired -- but she's not willing to do so for Bristol-Myers Squibb or for Dana-Farber. So as of right now, she's transiting back to Florida.

[Inventorship litigation docket, Dkt. No. 359, p. 52].

Dr. Wood appeared on the second day of trial and testified. [Inventorship litigation docket, Dkt. No. 360, p. 4]. When asked about the confusion surrounding his appearance the previous day,

Dr. Wood indicated that he had interpreted the news of the settlement, which came from Pfizer, to mean he would no longer be testifying. [Inventorship litigation docket, Dkt. No. 360, pp. 6-7]. Dr. Wood recalled that interaction as follows:

> I was informed by Pfizer's counsel that the matter had changed dramatically, they were withdrawing their support, and that all that would happen that morning would be that they would introduce there had been a settlement. So in my unfamiliarity with these legal matters, I thought, "Oh, dear." I was very disappointed, and as a result, I wasn't here. However, I was very happy indeed when I heard later in the morning that the Court wanted me to be here, and I'm very sorry to the Court if there was any misunderstanding on my part.

(Inventorship litigation docket, Dkt. No. 360, pp. 6-7).

Dr. Collins did not appear at trial. Pfizer's counsel commented that Dr. Collins's deposition evidence provided sufficient record of what would have been her testimony. [Inventorship litigation docket, Dkt. No. 359, p. 52]. Dana-Farber then proposed they use Dr. Collins' video deposition in place of her live testimony, and the court accepted. [Inventorship litigation docket, Dkt. No. 359, p. 53]. When Dana-Farber deposed Dr. Collins in the current litigation in July 2022, she said she could not recall Pfizer's counsel having told her about the court's instruction for her to appear at trial. [Dkt. No. 258-10, pp. 125-28]. However, Dr. Collins did recall that she had changed the date of her flight to Florida from Thursday, February 7, 2019 (the

fourth day of trial) to Tuesday, February 5, 2019 (the second day of trial) because it was communicated to her that the court would accept her previously recorded deposition "in lieu of testifying in person" and that she "did not need to testify in person."[4] [Dkt. No. 258-10, pp. 115-16]. Dr. Collins was unable to recall who had communicated this to her. [Dkt. No. 258-10, p. 116]. Dr. Collins also recalled having been home in Natick, MA, on Monday, February 4, 2019 (the first day of trial), though she could not recall specifically what she was doing that day. [Dkt. No. 258-10, pp. 109-10].

Dana-Farber prevailed in the inventorship litigation, and Drs. Freeman and Wood were declared joint inventors on all six patents identified in the amended complaint. [Inventorship litigation docket, Dkt. No. 389]. The court entered judgment on June 12, 2019. [Inventorship litigation docket, Dkt. No. 394].

### III. **PROCEDURAL HISTORY**

Dana-Farber initiated the present action on June 21, 2019, just nine days after judgment entered in the inventorship litigation, suing BMS and Ono for their conduct surrounding the patent dispute, including alleged bad faith litigation tactics.[5] Dana-Farber asserts the following claims against BMS and Ono: (1)

---

[4] Pfizer reimbursed Dr. Collins for the additional costs associated with changing her flight. *See* [Dkt. No. 258-11].

[5] It bears repeating that Pfizer is not a defendant in the instant suit but rather a non-party from whom the plaintiff has requested production.

unfair trade practices pursuant to Massachusetts General Laws
Chapter 93A ("Chapter 93A"); (2) tortious interference; and (3)
unjust enrichment. [Dkt. No. 82]. (The complaint also included
federal claims seeking corrections of inventorship for two
additional patents, but the court has since entered judgment on
those counts pursuant to a stipulation between the parties. [Dkt.
No. 82, pp. 35-37; Dkt. No. 125]). In the remaining state law
claims, Dana-Farber contends that BMS and Ono employed bad faith
and obstructionist litigation tactics in the inventorship
litigation to extend their capacity to assert themselves as sole
owners of the patents at issue and assert further that BMS and Ono
profited from that conduct at Dana-Farber's expense. [Dkt. No.
82, pp. 25-34].

BMS moved to dismiss the state claims on the grounds that,
*inter alia*, they were preempted by federal patent law. [Dkt. No.
90]. The court largely rejected the defendants' arguments and
ultimately denied the motion, but not before specifying that claims
of injury prior to May 17, 2019, when Drs. Freeman and Wood were
declared joint inventors on the patents, were indeed preempted by
federal patent law, while claims of injury after that declaration
were not preempted.[6] [Dkt. No. 166, pp. 19-21]. The court

---

[6] May 17, 2019 was the day the District Court entered its findings of fact
from the inventorship litigation trial. [Inventorship litigation docket,
Dkt. No. 389].

indicated, however, that BMS and Ono's conduct before and during the inventorship litigation remains potentially relevant to any non-preempted claim.  [Dkt. No. 166, pp. 19-21].

Fact discovery closed on August 1, 2022, by which point BMS and Pfizer had produced a substantial quantity of material in response to Dana-Farber's requests for documents and testimony related to the settlement agreement and witnesses.  [Dkt. No. 209]. Dana-Farber moved for leave to file these motions to compel under seal on August 5, 2022, [Dkt. No. 247], and did so file them on August 12, 2022.  [Dkt. No. 255; Dkt. No. 256].  On October 3, 2022, this court heard oral argument on the motions and took the matter under advisement.  [Dkt. No. 309].

## IV.  DISCUSSION

### A.  Relevance and Proportionality

For requested materials to be discoverable, they must be both "relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  The proportionality analysis considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*  While the information sought must be relevant to a party's

claim or defense, it need not be narrowly tailored to prove a claim or defense, as materials may be discoverable even if they are not admissible in evidence. *Id.*

Where, as here, a plaintiff seeks discovery, the operative complaint provides a starting point for determining whether the requested information is relevant to a claim. *See In re Subpoena to Witzel*, 531 F.3d 113, 118-19 (1st Cir. 2008) (considering relevance in light of plaintiff's equal protection claim). In its amended complaint, Dana-Farber alleges that the defendants have engaged in a "pattern of obstruction, unfair competition, unfair trade practices, and interference with Dana-Farber's exercise of its co-ownership rights" in the patents, before, during, and after the inventorship litigation. [Dkt. No. 82, ¶ 95]. Specifically, regarding its Chapter 93A claim, Dana-Farber alleges that the defendants used "bad faith, obstructionist litigation tactics" in order to "prolong their ability falsely to assert that they were exclusive owners of the [patents]." [*Id.* at ¶ 119]. In its motions to compel, Dana-Farber seeks materials related to the inventorship litigation that may or may not reveal an attempt to prevent witnesses from testifying at the trial, and thus obstruct the litigation. As such, the requested materials are facially relevant to Dana-Farber's Chapter 93A claim.

BMS asserts that the court's ruling on preemption precludes any possibility that materials from before or during the

inventorship litigation trial are relevant to this action.  Such a position misreads the ruling.  The court found that federal patent law preempted Dana-Farber's state law claims "to the extent [Dana-Farber] seeks monetary damages for unjust enrichment before the correction of inventorship." [Dkt. No. 166, p. 19].  The court went on to find that Dana-Farber's claims were not preempted to the extent that they allege the defendants harmed or continued to harm Dana-Farber after the correction of inventorship.  [*Id.*].  "The crux of this case," the court said, "is whether Defendants engaged in misconduct *when they used their status as sole inventors* to prohibit a potential co-inventor from exercising its rights under § 262 after the correction of inventorship." [*Id.* at pp. 19-20] (emphasis added).  Put differently, the root of this case is whether the defendants improperly engaged in conduct before the correction of inventorship that prevented Dana-Farber from benefitting after the correction.[7]  Far from being irrelevant, the defendants' pre-correction conduct is central to the case.

As to proportionality, Dana-Farber's request is not so disproportionate to the needs of the case as to bar discovery.  Both BMS and Pfizer have significant resources and are ably represented by counsel.  The amount in controversy appears to be

---

[7] The court specifically pointed to the restrictive covenant in the settlement agreement between BMS and Pfizer as "conduct that does not bear on federal patent policies," and thus does not give rise to a preemption issue.  [Dkt. No. 166, p. 20] (quoting *Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*, 196 F.3d 1366, 1371 (Fed. Cir. 1999)).

in at least the millions if not the billions of dollars. *See* [Dkt. No. 82, ¶ 6] (noting that defendants "have generated some $3 billion in licensing revenue" based on the patents).  It is undisputed that only BMS and Pfizer have access to the requested information.  Finally, and significantly, although the requested materials reportedly include hundreds of documents totaling thousands of pages, neither BMS nor Pfizer asserts that it would be unduly burdensome or expensive to produce the materials to Dana-Farber.  Indeed, both companies have already produced large volumes of similar (nonprivileged) materials without incident. Accordingly, the court finds that Dana-Farber's requests are both relevant and proportional, and thus within the scope of discovery.

### B.  <u>Timeliness</u>

Federal Rule of Civil Procedure 37 does not impose any deadlines on filing motions to compel.  However, "[d]istrict courts have broad discretion in pretrial management matters," including decisions regarding the timing of discovery.  *Curet-Valazquez v. ACEMLA de Puerto Rico, Inc.*, 656 F.3d 47, 54 (1st Cir. 2011) (affirming district court's decision to extend discovery deadline).  The court may deny a motion to compel as untimely, particularly if the delay would place an undue burden on the party from whom production is sought.  *See Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ship, S.E.*, 615 F.3d 45, 58-59 (1st Cir. 2010) (affirming denial of motion to compel filed after

deadline for production requests); *Alharbi v. TheBlaze, Inc.*, 199 F. Supp. 3d 334, 347-48 (D. Mass. 2016) (finding motion to compel filed after close of discovery timely).

Fact discovery in this case closed on August 1, 2022. [Dkt. No. 209]. Dana-Farber filed the instant motions to compel on August 12, [Dkt. Nos. 255, 256], seven days after seeking leave to file the motions under seal, [Dkt. No. 247], and two days after the court granted leave. [Dkt. No. 250]. The reason for the delay, according to Dana-Farber, is that it was unable to depose Dr. Collins until July 22, and it was only after obtaining her testimony that Dana-Farber had all the information it needed to file the motions.[8]  Under the circumstances, it does not appear that Dana-Farber has been dilatory in seeking discovery or, as discussed above, that requiring production at this stage would unduly burden BMS or Pfizer. Therefore, this court finds that the motions to compel are timely.

### C.  Governing Privilege Law

Before turning to the parties' arguments about whether the requested materials are privileged, it is necessary to determine whether federal or Massachusetts privilege law applies. Federal Rule of Evidence 501 provides that federal common law generally governs a claim of privilege, "[b]ut in a civil case, state law

---

[8] The delay in deposing Dr. Collins was reportedly due to Dana-Farber's ability to locate Dr. Collins. Dana-Farber represents that it served Dr. Collins with a deposition subpoena six weeks before the close of discovery.

governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501.  Ordinarily, when exercising diversity jurisdiction, "courts usually apply privilege law to all state claims." *Gargiulo v. Baystate Heath, Inc.*, 826 F. Supp. 2d 323, 325 (D. Mass. 2011); *see Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, 173 F.R.D. 7, 11 (D. Mass. 1997) (applying state privilege law in diversity case with no federal claims). By contrast, in a federal question case with both federal claims and pendent state law claims, federal privilege law applies. *Vanderbilt v. Town of Chilmark*, 174 F.R.D. 225, 226-27 (D. Mass. 1997) (collecting cases); *see also Gargiulo*, 826 F. Supp. 2d at 325; *Krolikowski v. Univ. of Mass.*, 150 F. Supp. 2d 246, 248 (D. Mass. 2001).  Notably, in these latter cases, a relevant motivating factor is that the potentially privileged evidence relates to both federal and state claims. *See Wilcox v. Arpaio*, 753 F.3d 872, 876 (9th Cir. 2014); *Fitzpatrick v. Am. Int'l Grp., Inc.*, 272 F.R.D. 100, 104 (S.D.N.Y. 2010) (citing *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987)).

In this action, Dana-Farber asserts both federal question and diversity jurisdiction.  As noted above, federal privilege law would typically apply in this context. *See von Bulow*, 811 F.2d at 141; *Smith v. Alex Peck Day Mem'l Hosp.*, 148 F.R.D. 51, 53 (D.N.H. 1993).  This case is unusual, though, in that judgment has already

entered on Dana-Farber's federal claims.[9]  As it stands now, this action is, in effect, a diversity suit in which only state law claims remain live.  As Massachusetts law supplies the rule of decision for these claims, Massachusetts law governs any related privilege disputes.  *See* Fed. R. Evid. 501.

Further, the materials Dana-Farber seeks through these motions are not relevant to its federal patent claims in this action.  Even if, in the best-case scenario for Dana-Farber, the requested materials contained irrefutable proof that BMS and Pfizer conspired to obstruct Dana-Farber from prevailing in the inventorship litigation by tampering with the witnesses, this would have minimal if any bearing on the inventorship of the two patents at issue in this action.  Dana-Farber, for its part, has never suggested that the requested materials relate to its current federal patent claims.  Indeed, Dana-Farber specifies multiple times in its reply memorandum that the materials are relevant to its Chapter 93A and unjust enrichment claims.  [Dkt. No. 291, pp. 2-4].[10]  All of this is to say that, because the requested materials relate to state law claims, and only to state law claims, state

---

[9] Strictly speaking, judgment entered in Dana-Farber's favor on counts V and VI while count VII was dismissed without prejudice.  Additionally, the court recognizes that the judgment may be vacated if the United States Supreme Court reverses or vacates the District Court's judgment in the inventorship litigation.  The mere possibility that the federal claims could be revived at some point in the future does not change the privilege analysis.

[10] At oral argument, this court asked counsel for Dana-Farber to which claim or claims the requested materials related.  Counsel unequivocally stated that the materials related to the Chapter 93A and unjust enrichment claims.  [Dkt. No. 316, p. 26].

law should apply to the privilege analysis.  *Cf. Wilcox*, 753 F.3d at 876; *Fitzpatrick*, 272 F.R.D. at 104.

In arguing that federal privilege law should apply here, Dana-Farber relies heavily on *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 835 F.3d 1155 (9th Cir. 2016).  In that case, prior to filing suit, the plaintiffs entered mediation with the defendant and successfully reached a settlement.  *Id.* at 1157.  The settlement remunerated the plaintiffs for damages inflicted by the defendant's alleged price-fixing in violation of federal antitrust law.  *Id.* at 1156-57.  Later, after the defendant repudiated the settlement, the plaintiffs filed suit, alleging federal and state antitrust claims and a breach of contract claim as to the settlement agreement.  *Id.* at 1157.  The plaintiffs later dismissed the antitrust claims, leaving only the state law breach of contract claim.  *Id.* at 1157-58.  Even though the plaintiffs were left with only a state law claim, the Ninth Circuit held that federal privilege law applied to the settlement agreement because, "at the time the parties engaged in mediation, their negotiations concerned (and the mediated settlement settled) both federal and state law claims."  *Id.* at 1159.

The situation here is meaningfully different.  First, the settlement agreement at issue was not between the parties in this action but rather between BMS and Pfizer, a nonparty.  Second, unlike in *In re TFT-LCD*, the settlement concerned claims in a *prior*

17

action that are separate from the claims in *this* litigation.[11]
While the settlement agreement does relate to some federal claims,
it does not relate to the federal claims at issue in this action.

In short, because only Dana-Farber's state law claims remain,
and because the requested materials are only relevant to those
state law claims, state privilege law governs.

D.  **Waiver**

BMS and Pfizer assert that the requested materials are
protected by the attorney-client privilege.  The attorney-client
privilege shields from the view of third parties all confidential
communications between clients and their attorneys undertaken for
the purpose of obtaining legal advice.  *Suffolk Const. Co. v. Div.
of Cap. Asset Mgmt.*, 449 Mass. 444, 448 (2007).  One of the central
purposes of attorney-client privilege is to encourage clients to
speak freely and honestly with their counsel, which in turn
"promote[s] broader public interests in the observance of law and
administration of justice." *Id*. at 449 (quoting *Upjohn Co. v.
United States*, 449 U.S. 383, 389 (1981)).

Dana-Farber argues that BMS and Pfizer have each waived the
privilege.  Massachusetts law contemplates two kinds of waivers.
In the first, the privilege holder explicitly waives the privilege.

---

[11] The court's memorandum and order denying the defendants' motion to dismiss
(Dkt. No. 166) makes this clear: "[T]he claims in this case are distinct from
those in the Inventorship Case."  [Dkt. No. 166, p. 12].

*See Phillips v. Chase*, 201 Mass. 444, 449 (1909).  In the second, the privilege holder "implicitly waive[s] the attorney-client privilege . . . by injecting certain claims or defenses into a case." *Darius v. City of Bos.*, 433 Mass. 274, 277 (2001).  Waivers of this type are generally limited in scope, covering only what has been put "at issue." *Darius*, 433 Mass. at 283.

### 1. *BMS's Letter to the Court*

Dana-Farber asserts that BMS waived its privilege regarding the settlement negotiations when it submitted a letter to the court on May 5, 2021.  [Dkt. No. 129].  The letter, submitted under seal, sought to provide additional context around the settlement agreement following a motion hearing held on April 26, 2021, during which Dana-Farber referred to the contingent payment as a "bonus" and the court referred to it as a "bribe almost."  [Dkt. No. 129, p. 2].  In its letter, BMS explained that the so-called "bonus" provision was a compromise meant to reflect the uncertain economic benefit of the settlement to BMS given that Dana-Farber's inventorship suit against BMS was still pending.[12]  [Dkt. No. 129, p. 3].  Dana-Farber characterizes the letter as BMS "giving the Court its own scripted version of the internal discussions leading

---

[12] BMS also noted that the settlement did not preclude Dr. Wood's involvement in the trial, that BMS had been negotiating potential settlement agreements with both Dana-Farber and Pfizer in the inventorship litigation, and that BMS was asserting the patents at issue in separate litigations against Pfizer and other parties.

to the witness and bonus provisions [of the settlement agreement]." [Dkt. No. 257, p. 15].   Consequently, the argument goes, BMS has put these internal discussions at issue, and thus waived its privilege regarding them.

Dana-Farber's argument suffers from a certain level of imprecision.   BMS's letter explains some of the concerns facing BMS on the eve of the inventorship litigation trial and how those concerns shaped the settlement agreement.   While it is reasonable to expect that BMS discussed these concerns with counsel, the letter does not disclose the content or even the existence of any such discussions.   The attorney-client privilege applies to confidential communications between clients and attorneys. *Suffolk Const. Co.*, 449 Mass. At 448.   It is hard to see how BMS could have put its privilege "at issue" without disclosing or even acknowledging a confidential communication.

Notably, BMS has already produced a substantial volume of non-privileged materials regarding the negotiation of the settlement agreement, including all the emails on the subject between BMS and Pfizer.[13]   To the extent that Dana-Farber has a right to test the characterizations BMS makes in its letter, it is not clear why Dana-Farber needs access to BMS's communications with counsel in addition to what it already has.   Regardless, BMS's

---

[13] Dana-Farber also deposed Henry Hadad, who was one of the lawyers at BMS involved in negotiating the settlement agreement.   *See* [Dkt. No. 258-8].

letter to the court did not put BMS's confidential communications "at issue," and so it did not effect a waiver.

## 2.  *Pfizer's Statements to the Court*

As to Pfizer, Dana-Farber argues (in summary fashion) that Pfizer "waived any assertion of privilege related to communications with Dr. Wood and Dr. Collins about the settlement agreement and their whereabouts in the first days of trial" by (1) informing the court about counsel's conversations with Drs. Wood and Collins on the first day of trial; (2) failing to object when Dr. Wood testified during trial about his conversation with counsel; and (3) failing to object when Dr. Collins testified at her deposition about being told she did not have to appear at trial.  [Dkt. No. 257, pp. 16-17].  Pfizer represents that it "has not withheld any communications between Pfizer, on the one hand, and Dr. Wood, Dr. Collins, or Dr. Long on the other hand."  [Dkt. No. 282, p. 12] (emphasis omitted).

Assuming Pfizer's communications to the court and Dr Wood's and Dr. Collins's testimony did effect a waiver as described above, that waiver would be limited to the communications disclosed, i.e., communications between Pfizer's counsel and the two doctors.  *See Clair v. Clair*, 464 Mass. 205, 219 (2013) ("at issue" waiver is limited "with respect to what has been put 'at issue'"); *see also Commonwealth v. Brito*, 390 Mass. 112, 119 (1983) (recognizing that criminal defendant's claim of ineffective assistance of counsel

waives attorney-client privilege in part, but not entirely).  Dana-Farber offers no explanation for how disclosures of two conversations between Pfizer and Drs. Wood and Collins could waive the privilege as to all communications among Pfizer's lawyers *about* the witnesses for a span of over two weeks.  Accordingly, the court finds that Pfizer has not waived its privilege as to the requested communications.

### E.  Crime-Fraud Exception

The crime-fraud exception to the attorney-client privilege is a mechanism by which courts may order the production of allegedly privileged materials when presented with sufficient evidence that those materials contain client communications seeking assistance in or furtherance of future criminal conduct.[14]  *In re Grand Jury Investigation*, 453 Mass. 453, 457 (2009) (citing *Purcell v. Dist. Att'y for Suffolk Dist.*, 424 Mass. 109, 114 (1997)).  The crime-fraud exception is designed "to assure that the 'seal of secrecy,' ... between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime."  *Purcell*, 424 Mass. at 109 (quoting *United States*

---

[14] Though the parties do not appear to argue the existence of a meaningful, legal distinction, Massachusetts law holds that the crime-fraud exception applies to both the attorney-client privilege and work-product doctrine.  *In re Grand Jury Investigation*, 437 Mass. 340, 357 (2002).  Thus, while much of the case law discusses the crime-fraud exception in terms of attorney-client privilege, the same exception would likewise apply to any materials where parties have asserted protection under the work-product doctrine.

*v. Zolin*, 491 U.S. 554, 563 (1989)).  Under Massachusetts law, the crime-fraud exception is "a narrow one," and the party invoking the exception must establish its applicability by a preponderance of the evidence.  *In re Grand Jury Investigation*, 437 Mass. 340, 357 (2002) (describing *Purcell*, 424 Mass. at 113).  Dana-Farber has not met this standard.

Dana-Farber suggests that BMS and Pfizer, through counsel, violated three federal statutes through their execution of the settlement agreement and Pfizer's communications with the witnesses: 18 U.S.C. § 1503 ("obstruction of justice"); 18 U.S.C. § 1512(b)(1) ("witness tampering"); and 18 U.S.C. § 201(b)(3) ("witness bribery").  [Dkt. No. 257, p. 19].  Dana-Farber also alleges that Pfizer perpetrated a fraud on the court through its comments about Dr. Collins's whereabouts on the first day of trial. [Dkt. No. 316, p. 25].

### 1.  *Evidence of a Crime or Fraud*

To support its assertions, Dana-Farber has put forward two broad sets of evidence: (1) the settlement agreement itself, including the "bonus provision" and the "witness provision," as well as the timing, communications, and other circumstances surrounding the deal more broadly; and (2) the nonappearance of Drs. Wood and Collins on the first day of trial in the inventorship litigation, their whereabouts and subsequent explanations for not

appearing as scheduled, and comments made by Pfizer's counsel at the time regarding these witnesses and their whereabouts.   [Dkt. No. 257, pp. 17-24].   Based on this evidence, Dana-Farber has not proven by a preponderance of the evidence that the materials over which BMS and Pfizer have asserted privilege contain evidence of a crime or fraud.

While certain aspects of the settlement agreement are troubling, as discussed below, Dana-Farber has not proven that the agreement itself is criminal or fraudulent.   The terms of the agreement, including the "bonus" provision and the "witness" provision with its subpoena exception, are no more consistent with a conspiracy to obstruct justice or tamper with witnesses than they are with sharp (but legal) business and litigation tactics. *See Alston v. Town of Brookline*, 997 F.3d 23, 51-52 (1st Cir. 2021) (noting that non-cooperation clauses in settlement agreements were "controversial" but declining to invalidate agreements in light of subpoena exception).

Likewise, the confusion surrounding Drs. Wood and Collins's whereabouts during trial could be the result of unfortunate but good-faith mistakes and miscommunications.   Dr. Wood appeared on the second day of trial as directed and attributed his absence the day before to his own misunderstanding.   While the circumstances surrounding Dr. Collins are murkier, all Dana-Farber has

established is that Dr. Collins was in Natick on the first day of trial and that an unknown person informed her at an undetermined time that she did not need to appear in person.  While it is possible that Pfizer intentionally made misrepresentations to both the court and Dr. Collins on the first day of trial, it is at least as plausible that Pfizer's comments to the trial court were unintentionally vague or misleading and that counsel only told Dr. Collins that she did not need to appear after the court had agreed to accept her deposition testimony instead.  As such, Dana-Farber has failed to prove by a preponderance of the evidence that BMS and/or Pfizer engaged in a crime or fraud.

Although Massachusetts law governs the privilege inquiry here, the court notes that Dana-Farber would fail to satisfy even the more permissive federal standard.  Under the federal standard, the party invoking the crime-fraud exception to privilege must make a showing that there is "a reasonable basis to believe that the lawyer's services were used by the client to foster a crime or fraud."  In re Grand Jury Proc., 417 F.3d 18, 23 (1st Cir. 2005). Under this standard, "neither speculation nor evidence that shows only a distant likelihood of corruption is enough." *Id.*  The evidence Dana-Farber has put forward does not clear this hurdle. Again, while the circumstances surrounding the settlement agreement and Dr. Collins's nonappearance are questionable, the

circumstances by themselves are insufficient to demonstrate a crime or fraud.[15]

### 2. In Camera *Review*

Where a party asserts that the crime-fraud exception applies to allegedly privileged materials but cannot make the requisite showing, that party may request *in camera* review to evaluate their assertion "when justified." *United States v. Zolin*, 491 U.S. 554, 571 (1989) (internal quotation omitted). Namely, the court has discretion to conduct an *in camera* review of the allegedly privileged materials at a party's behest "on a showing of a factual basis adequate to support a reasonable belief that an *in camera* review of the evidence may establish that the [crime-fraud] exception applies." *Purcell*, 424 Mass. at 113 (1997) (citing *Zolin*, 491 U.S. at 572). This threshold showing may be met by using any relevant evidence "that has not been adjudicated to be privileged." *Id*. at 575. In deciding whether *in camera* review is warranted, the court should consider the facts and circumstances of the case, the volume of materials the court has been asked to review, the relative importance of those materials to the case, and the likelihood that the evidence produced through the review

---

[15] The court notes that Dana-Farber has largely focused its crime-fraud arguments on meeting the more lenient standard for *in camera* review. *See, e.g.*, [Dkt. No. 316, pp. 21-22].

will help establish that the crime-fraud exception does indeed apply. *Id.* at 572.

There are two key differences under Massachusetts law between the *in camera* review standard and the crime-fraud standard writ large. The first is that *in camera* review employs a "reasonable basis" standard, which is something less than a preponderance of the evidence. *See Purcell*, 424 Mass. at 113; *United States v. Gorski*, 807 F.3d 451, 460 (1st Cir. 2015) (reasonable basis standard "may be met by something less than a mathematical (more likely than not) probability") (internal quotation omitted).[16] The second, which is salient here, is that *in camera* review is justified if "review of the [requested] evidence *may* establish that the exception applies," as opposed to a showing that the exception *does* apply. *See Purcell*, 424 Mass. at 113 (citing *Zolin*, 491 U.S. at 572) (emphasis added). The operative question is whether the evidence Dana-Farber presents, which is insufficient to establish the crime-fraud exception outright, nevertheless supports a reasonable belief that *in camera* review may establish that the exception applies. *See id.* It does. As there are two separate categories of documents requested in the motions, it is appropriate to weigh *in camera* review as it applies to each.

---

[16] Under federal law, the reasonable basis standard applies in both instances. *See In re Grand Jury Proc.*, 417 F.3d at 423.

With respect to the first document request, seeking internal communications and communications with outside counsel pertaining to the settlement, the "bonus provision," the "witness provision," and the surrounding circumstances warrant a closer look.  In its May 5, 2021 letter to the court, BMS framed the "bonus" payment from BMS to Pfizer, which was contingent on BMS prevailing over or settling with Dana-Farber in the inventorship litigation, as an instance of two negotiating parties "bridging [the] settlement gap" between their proposed lump sum figures to be paid to Pfizer as part of the settlement.  [Dkt. No. 258-16, p. 3].  At oral argument, Pfizer likewise characterized the contingent payment as an instance of the two parties "trying to get to yes."  [Dkt. No. 316, pp. 52-53].

The court does not find these explanations particularly convincing.  A review of earlier drafts of the settlement agreement belies the notion that the contingent payment somehow filled a gap between BMS's and Pfizer's proposed lump sums.  *See* [Dkt. No. 258-5, p. 9; Dkt. No. 258-6, p. 9; Dkt. No. 258-17, p. 110].  Like the presiding court, this court is troubled by the optics of the "bonus" provision, and BMS's and Pfizer's explanations do little to assuage any concerns.  While the agreement itself is not facially illegal, this appearance of impropriety is enough to support a reasonable belief that *in camera* review of the relevant materials may establish that the crime-fraud exception applies.

As to the "witness provision," this court is not convinced that the exception allowing for any witness to testify when compelled by subpoena is enough to clear all doubts. While the First Circuit upheld this sort of non-cooperation clause with a subpoena exception in *Alston v. Town of Brookline*, the facts here are different in two important respects. In *Alston*, the plaintiff was aware of the non-cooperation clauses at issue well before trial. 997 F.3d at 51. Here, BMS and Pfizer entered into their settlement agreement the night before trial began, allowing Dana-Farber practically no time to issue subpoenas to witnesses who were up to that point expected to appear, voluntarily. This difficulty was compounded by the fact that, by the time Dana-Farber was aware of Dr. Collins's nonappearance, she was already allegedly on her way to Florida, and thus beyond the court's subpoena power. Under those circumstances, the subpoena exception could have hardly done anyone much good. While it may very well be that BMS and Pfizer included the exception in a good faith attempt to strengthen the settlement agreement, it might also be the case that the parties used the exception as a screen for an attempt to prevent witnesses from testifying at trial. *In camera* review may shed some light on which is the case.

With respect to the second document request, seeking internal communications and communications with outside counsel pertaining to the witnesses, the circumstances surrounding the nonappearance

of Dr. Collins as a live trial witness give the court similar pause. Upon learning of the settlement agreement on the literal eve of trial, Dana-Farber asked Pfizer to be put in contact with their joint witnesses, who had only been in contact with Pfizer up to that point, including Dr. Collins. Pfizer did not respond. [Inventorship litigation docket, Dkt. No. 359, p. 14]. While the exact timing of the relevant events on the first day of trial remains unclear, there is some indication that (1) Pfizer informed the court that Dr. Collins was on her way to Florida when it knew that she was still in Massachusetts; (2) Pfizer failed to inform Dr. Collins that the court ordered her to appear; and (3) Pfizer prematurely informed Dr. Collins that the court would accept her deposition testimony in lieu of her appearance. *See* [Inventorship litigation docket, Dkt. No. 359, pp. 52-53; Dkt. No. 258-10, pp. 115-16]. BMS's and Pfizer's internal communications about Dr. Collins on or around that day may shed light on whether Pfizer actually made any misrepresentations to the court or Dr. Collins and whether any such misrepresentations were intended to prevent Dr. Collins from testifying. Accordingly, there is a reasonable basis to believe that *in camera* review may establish whether the crime-fraud exception applies.[17]

---

[17] BMS objects to producing its internal communications relating to the witnesses on the grounds that it had no contact with the witnesses as an opposing party. The court trusts that BMS nonetheless has at least some materials responsive to this request. Presumably, if BMS did not have any

To be clear, this court does not make any findings as to whether BMS or Pfizer has in fact done anything untoward, nor has the court yet determined whether production of the allegedly privileged documents will ultimately be appropriate. Nevertheless, the bar for *in camera* review is low, and Dana-Farber has cleared it.

### V.   CONCLUSION

For the foregoing reasons, BMS and Pfizer shall provide all materials in their possession that are responsive to the requests outlined in the motions to compel to the clerk of the court by the close of business on Friday, November 4, 2022.  The court reserves its ruling on the motions to compel pending its *in camera* review of the requested materials.


So Ordered.                              /s/ Donald L. Cabell
                                         DONALD L. CABELL, U.S.M.J.

DATED:  October 28, 2022

---

responsive materials, it would have so informed Dana-Farber, obviating the need to litigate the issue.  *See* Fed. R. Civ. P. 26(b)(5)(A) (requiring a party who "withholds information otherwise discoverable by claiming that the information is privileged" to describe the nature of the withheld materials in such a way as to "enable other parties to assess the claim" of privilege).